UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.  2:11-cr-00387-KJM |
| Plaintiff, | |
| v. | ORDER |
| MATTHEW A. SARAD, | |
| Defendant. | |

On August 6, 2014, Matthew A. Sarad pled guilty to securities fraud.  Mins. from Plea Hr'g, ECF No. 61.  Part of Sarad's plea deal included an agreement to abide by court-ordered restitution between $6.5 and $7.5 million.  Plea Agreement, ECF No. 63.  On November 26, 2014, the government recommended a restitution award of $7,052,200.52.  Presentence Investigation Report (PSR) 22–35, ECF No. 70.  On August 26, 2015, Sarad was sentenced to prison.  Mins. from Sentencing, ECF No. 100.  The parties agreed to waive the requirement that restitution be awarded within ninety days of Sarad's sentencing.  Stipulation, ECF No. 109.  On October 26, 2015, Sarad filed a pleading arguing for no restitution and claiming the government failed to prove Sarad actually caused the victims' losses.  Def.'s Restitution Br., ECF No. 104.  The matter is now before the court on the question of whether the record supports the government's proposed restitution award.  For the reasons discussed below,

1   the court finds for the government on the issue of restitution, and accordingly ORDERS

2   restitution in the amount of $7,052,200.52.

3   I.      BACKGROUND

4           A.      Relevant Facts Relating to Sarad's Fraudulent Misrepresentations

5                   The government charged Sarad with securities fraud for false statements he made

6   in connection with sales of stock in Telomolecular Corporation ("Telomolecular").  Superseding

7   Information, ECF No. 58.  Sarad and the government entered a plea agreement on August 6,

8   2014, in which Sarad pled guilty to committing fraudulent interstate transactions, in violation of

9   15 U.S.C. §§ 77q(a) and 77x.  ECF No. 63.  In his plea agreement, Sarad admitted the following

10  facts.

11                  Sarad was the founder and chief executive officer of Telomolecular.  *Id.* Ex. A at

12  1.  Telomolecular held itself out as a biotechnology startup and claimed to have developed

13  nanoparticle technology that could cure cancer and treat other age-related diseases.  *Id.*  Between

14  November 2005 and July 2008, Sarad and Telomolecular raised approximately $6.5 million from

15  more than 300 investors across the United States.  *Id.*  This fundraising was accomplished mostly

16  by the selling of stock not properly registered with the Securities and Exchange Commission.  *Id.*

17  Sarad also made several material misrepresentations about Telomolecular and its research in

18  connection with the sale of the unregistered stock.  *Id.*  For example, Sarad told investors the

19  company would complete government trials and be available on the market within three years,

20  and that the University of Nebraska was doing research for Telomolecular with "exciting" and

21  "very encouraging results."  *Id.*  Sarad said Telomolecular believed its products could cure

22  cancer, and that the company had regenerated aged tissue samples that remained permanently

23  "young."  *Id.*  He falsely reported Telomolecular employed a management team with years of

24  relevant experience, including a team of more than fifty scientists, and that Telomolecular's work

25  was generating interest within the industry and among financial institutions.  *Id.*  He also told

26  investors Telomolecular would have an estimated market capitalization of $400 million.  *Id.*

27                  In addition to Telomolecular, Sarad made misrepresentations relating to Sun

28  Nanosystems, a company that he owned for a year in 2009.  *Id.* at 2.  Sun Nanosystems purported

1    to be in the business of installing solar energy systems and falsely claimed to have developed

2    nanoparticle technology that made solar panels fifty percent more efficient. *Id.* The company

3    falsely represented to customers that it was experienced in installing these systems, that its

4    customers were satisfied, and that it had installed these systems for large, organizational clients.

5    *Id.* Under Sarad's direction, Sun Nanosystems sold six systems and collected $300,000, but

6    never installed any of them. *Id.*

7          B.     Procedural History Relating to Restitution

8               As part of his plea deal, Sarad agreed to pay restitution to the victims of the above-

9    mentioned fraudulent misrepresentations. *See* ECF 63 at 3. Specifically, Sarad agreed to the

10   following:

> The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of certain offenses. Defendant agrees that his conduct is governed by the Mandatory Restitution Act pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii) and agrees to pay the full amount of restitution to all victims affected by this offense, including, but not limited to, the victims covered in the factual basis, victims covered in those counts to be dismissed as part of the plea agreement pursuant to 18 U.S.C. § 3663A(a)(3), and any other victims of the defendant's conduct for the offenses charged from time periods of November 2005 through July 2008 and January 2009 through December 2009. The amount of restitution is estimated between $6.5 and $7.5 million . . . .

18   *Id.* at 3:2–13. On August 6, 2015, at his change-of-plea hearing, Sarad affirmed the agreement

19   that he would pay restitution between $6.5 and $7.5 million. *See* Hr'g Tr. 6–8, ECF No. 96

20   ("Ms. Bickley: . . . The defendant will pay restitution as ordered by the Court. It is presently

21   estimated that the restitution will be between 6.5 million and 7.5 million dollars. . . . The Court:

22   Mr. Sarad, does that in fact accurately summarize your agreement with the government as you

23   understand it? The Defendant: It does."). The government also included a recommended

24   restitution of $7,052,200.52 in Sarad's presentence report, ECF No. 70, and Sarad did not object

25   to that amount. On August 26, 2015, the court sentenced Sarad to forty-eight months in prison

26   and thirty-six months of supervised release. ECF No. 100; Judgment, ECF No. 101.

27              On October 26, 2015, Sarad requested an order of no restitution, arguing the

28   government failed to adequately prove the $7,052,200.52 figure in his presentence report. ECF

No. 104.  On October 27, 2015, the government opposed Sarad's request.  Gov't Restitution Br., ECF No. 106.  On November 3, 2015, the court held a restitution hearing and set a schedule for supplemental briefing regarding the issue of causation between Sarad's misrepresentations and the actual estimate of the victims' losses.  ECF No. 107.  Sarad filed his supplemental brief on November 10, 2015, ECF No. 110, and the government responded on November 17, 2015, ECF No. 113.

Sarad supports his request for an order of no restitution by characterizing the government's evidence of the victims' losses as a "generalized loss summary" in which the government "made no attempt to prove up the actual losses that were proximately caused by [his] conduct."  ECF No. 110.  Sarad submits that the more sophisticated investors likely attributed no weight to his misrepresentations when they chose to invest, and therefore his misrepresentations did not cause their harm.  *Id.* at 3.  Sarad also argues that, because he left Telomolecular years before the company's ultimate demise, it may not have been his misinformation or misrepresentation, but rather the 2008 financial crisis or subsequent mismanagement that caused the company to fail.  *Id.* at 3.  Sarad also suggests the government's restitution estimates are inaccurate as Telomolecular ultimately did use some of the investors' money to pay "real scientists to perform real research," as promised.  *Id.* at 2–3 (quoting Sentencing Stip. 1, ECF No. 97).  Lastly, Sarad argues the causation issue in this case is so complex that the court should decline to award restitution altogether.  *Id.* at 4; ECF No. 104 at 3–4 (citing the MVRA complexity exception codified in 18 U.S.C. § 3663A(c)(3)(B)).

The government argues a restitution award of $7,047,200.52 is appropriate because that figure is derived directly from victims' bank statements and because the factual admissions in Sarad's plea agreement remove causation as a disputed or disputable issue.  ECF No. 106 at 4–5.  To prove causation, the government cites the portion of Sarad's plea agreement where he agreed investors bought stocks based partially on his material misrepresentations.  Gov't Suppl. Br. at 1–2, ECF No. 113.  The government contends that because causation is not at issue, the case does not fall within the MVRA complexity exception.  *Id.* at 2–3.  To rebut Sarad's suggestion that sophisticated investors placed little weight on his misrepresentations, the

4

1  government submits a letter from just such an investor stating the contrary.  *See id.* Ex. A at 2

2  (explaining Sarad and Telomolecular fed sophisticated investors "a steady stream of false hope

3  and promises" among other "distortions" and half-truths).  The government also argues any

4  factors that subsequently influenced the value of Telomolecular's investments are irrelevant to a

5  restitution order.  *Id.* at 2-3.

6  II.    DISCUSSION

7          The MVRA, which governs restitution in this case, "makes restitution mandatory

8  for particular crimes, including those offenses which involve fraud or deceit."  *United States v.*

9  *Gordon*, 393 F.3d 1044, 1048 (9th Cir. 2004) (citing 18 U.S.C. § 3663A(c)(1)(A)(ii)); *see* ECF

10  No. 63 at 3.  The purpose of the MVRA is "to ensure that the loss to crime victims is recognized,"

11  that "[victims] receive the restitution that they are due," and that the "offender pays the debt owed

12  to the victim as well as to society."  *United States v. Cienfuegos*, 462 F.3d 1160, 1165 (9th Cir.

13  2006).  To trigger mandatory restitution under the MVRA, the government must prove, by a

14  preponderance of the evidence: (1) the number of victims to whom defendant owes restitution and

15  (2) the amount of restitution defendant owes each victim.  *United States v. Waknine*, 543 F.3d

16  546, 558 (9th Cir. 2008) (citing 18 U.S.C. § 3664(e)).  If the government proves these two

17  elements, court-ordered restitution is mandatory for each person "directly and proximately

18  harmed as a result of [the covered offenses]," 18 U.S.C. § 3663A(a)(2), and any "persons other

19  than the victim of the offense" if "agreed to by the parties in a plea agreement." 18 U.S.C.

20  § 3663A(a)(3).

21          Although restitution is presumptively mandatory under the MVRA, the statute

22  delineates an exception whereby the court may decline to order restitution in cases where

23  calculating restitution is unusually complex or burdensome.  18 U.S.C. § 3663A(c)(3)(B).[1]  Sarad

24  argues this "MVRA complexity exception" applies in this case because the court would have to

25  _____

26          [1] MVRA's complexity provision provides that "if the court finds, from facts on the record
-- . . . that determining complex issues of fact related to the cause or amount of the victim's losses
27  would complicate or prolong the sentencing process to a degree that the need to provide
restitution to any victim is outweighed by the burden on the sentencing process," then the court is
28  not obliged to provide restitution under the MVRA. 18 U.S.C. § 3663A(c)(3)(B).

5

1   engage in a lengthy and complicated evidentiary process to determine causation.  ECF No. 104 at

2   3–4; ECF 110 at 4.  Because the complexity exception could counsel against restitution

3   altogether, the court first examines whether the complexity exception applies, and then moves on

4   to determining the appropriate amount of restitution to award, if any.

5           A.      <u>The MVRA Complexity Exception</u>

6          The MVRA "complexity exception" permits a sentencing court to decline to award

7   restitution to a fraud victim where the burden in calculating restitution outweighs the need to

8   compensate a particular victim.  *See United States v. Gallant*, 537 F.3d 1202, 1247 (10th Cir.

9   2008).  More specifically, 18 U.S.C. § 3663A(c)(3)(B) relieves a district court of its obligation to

10  impose restitution for fraud crimes if the court finds "determining complex issues of fact related

11  to the cause or amount of the victim's losses would complicate or prolong the sentencing process

12  to a degree that the need to provide restitution to any victim is outweighed by the burden on the

13  sentencing process."  18 U.S.C. § 3663A(c)(3)(B).  A district court's decision to invoke this

14  exception is reviewed for abuse of discretion.  *See Cienfuegos*, 462 F.3d at 1162.

15         The Ninth Circuit has analyzed the MVRA complexity exception only twice, and

16  both times found it inapplicable.  *United States v. Conway*, 323 F. App'x 517 (9th Cir. 2009)

17  (affirming the district court's refusal to apply the exception); *Cienfuegos*, 462 F.3d at 1168

18  (holding district court abused its discretion by invoking the MVRA complexity exception, and

19  explaining a determination of future lost earnings is not enough to trigger exception).  Other

20  circuit courts have examined the complexity exception and made clear that a district court cannot

21  avoid its obligation to award restitution under the MVRA simply because the government is

22  unable to prove the exact sum a victim lost as a result of the defendant's conduct.  *Gallant*, 537

23  F.3d at 1251–54; *see also United States v. Futrell*, 209 F.3d 1286, 1292 (11th Cir. 2000) (holding

24  restitution could be based on reasonable estimate of losses when it would be impossible to

25  determine precise amount); *United States v. Jackson*, 155 F.3d 942, 949 n.3 (8th Cir. 1998) ("in a

26  case of fraud or theft, the loss need not be determined with precision").  Rather, a sentencing

27  court may safely resolve restitution uncertainties "with a view towards achieving fairness to the

28  victim," so long as it still makes a "reasonable determination of appropriate restitution" rooted in

1  a calculation of actual loss. *United States v. Vaknin*, 112 F.3d 579, 587 (1st Cir. 1997) (quotation

2  omitted).

3          Here, this matter is not so complex as to warrant an exception to the MVRA under

4  section 3663A(c)(3). There is sufficient evidence in the record to support the government's

5  recommended restitution award. Although Sarad attempts to frame the restitution issue before the

6  court as raising a complicated threshold determination of causation, Sarad's plea agreement and

7  subsequent letters to the court have established causation. In his plea agreement, Sarad admits he

8  "raised approximately $6.5 million from over 300 investors across the country through the

9  fraudulent sale of securities." ECF No. 63 at A-1. Sarad further admits that he, "together with

10  others acting under his direction and using information provided by him, solicited individuals

11  nationwide to invest in Telomolecular, primarily through the purchase of stock." *Id.* "In selling

12  the Telomolecular stock, Sarad obtained money by means of untrue statements of material facts,"

13  and Sarad also "omitted statements of material facts." *Id.* Sarad also admits every investor listed

14  in the government's victim loss sheet was exposed to his material misrepresentations. *Id.*

15  Despite these admissions, Sarad now argues: (1) the government cannot prove the victim-

16  investors actually relied on Sarad's false statements when they chose to invest; (2) the

17  government cannot prove how much money his statements alone reduced the value of the

18  investment; and (3) the calculation of restitution is complicated by the fact that some of the

19  victims' money actually went into scientific research. ECF No. 110 at 3.

20          The court is not persuaded by Sarad's arguments. As to his first argument, the

21  degree to which investors relied on his misrepresentations is inconsequential, because the

22  "[d]efendant's conduct need not be the sole cause" of the victims' decision to invest, as long as

23  intervening causes also directly relate to the defendant's conduct. *United States v. Gamma Tech

24  Indus., Inc.*, 265 F.3d 917, 928 (9th Cir. 2001). Moreover, a letter from J.S., one of

25  Telomolecular's largest investors, exemplifies sophisticated investors' reliance in fact on Sarad's

26  misrepresentations. *See* ECF No. 113, Ex. A. Specifically, the letter explains how Sarad and

27  Telomolecular fed sophisticated investors "a steady stream of false hope and promises" among

28

7

1    other "distortions" and half-truths.  *Id.* at 2.  The court need not embark on a fact-finding mission

2    to determine how much weight these investors attributed to Sarad's misrepresentations.

3           The court is also not persuaded by Sarad's claim that the government cannot prove

4    how much of the victims' losses are attributable to Sarad's misstatements.  Sarad argues the 2008

5    financial crisis and the subsequent Telomolecular leadership may be partially to blame for

6    devaluing the victims' investments.  ECF No. 110 at 3.  However, even where other "contributing

7    factors" might have compounded the victims' losses giving rise to restitution, the district court

8    does not have to apportion restitution, where, as here, the defendant has been found culpable and

9    the causal chain "is not extended so far as to become unreasonable."  *United States v. Peterson*,

10   538 F.3d 1064, 1077 (9th Cir. 2008).  Moreover, Sarad cannot alleviate his own liability by citing

11   subsequent factors that depreciated Telemolecular stock further, because Sarad is the one who

12   bears the risk for the loss of investments he fraudulently obtained.  *See Gordon*, 393 F.3d at 1053

13   (when determining restitution in securities fraud cases, it is appropriate for "district courts to

14   place the risk of downward fluctuations in stock prices on defendants rather than victims")

15   (citation omitted).

16          Lastly, Sarad suggests the calculation of restitution is complicated by the fact that

17   Telomolecular ultimately did use some of the investors' money to pay "real scientists to perform

18   real research," such that their investments were not valueless.  ECF No. 110 at 2–3 (quoting

19   Sentencing Stip. 1, ECF No. 97).  However, what eventually happened to the investor's money is

20   irrelevant under the MVRA because the statute provides for calculating restitution based on what

21   the victims lost at the time of Sarad's fraudulent conduct, not afterwards.  *See Gordon*, 393 F.3d

22   at 1053 ("[t]he purpose of restitution is . . . to restore the defrauded party to the position he would

23   have had absent the fraud").  Here, the investors were fraudulently induced to invest in the first

24   place and are therefore entitled to recover their full investment.  Moreover, a defendant's

25   subsequent action only alters a restitution award under the MVRA when the action physically

26   returns any fraudulently-obtained funds or property to the victims.  *See* 18 U.S.C.

27

28

1   § 3663(b)(1)(B)(ii).[2]  The "real research" Telomolecular paid scientists to perform with the

2   investors' money did not physically return property or funds to the victims and is therefore not

3   relevant.

4           Thus, Sarad raises no new issues that call causation into question, and the court

5   therefore need not delve into the facts Sarad throws out at this late stage.

6           The MVRA exception does not apply in this case.  The court thus turns the

7   question of whether the government has met its burden to prove the recommended $7,047,200.52

8   restitution award.

9       B.      Calculation of Sarad's Restitution Obligation

10          To prove restitution in this case, the government must show, by a preponderance

11  of the evidence: (1) the identity of the victims; and (2) the amount of restitution the defendant

12  owes to each victim.  *Waknine*, 543 F.3d at 556.  Under the MVRA, a "victim" is any

13          person directly and proximately harmed as a result of the
14          commission of an offense . . . including, in the case of an offense
            that involves as an element a scheme, conspiracy, or pattern of
15          criminal activity, any person directly harmed by the defendant's
            criminal conduct in the course of the scheme, conspiracy, or
16          pattern.

17  18 U.S.C. § 3663A(a)(2); *Gallant*, 537 F.3d at 1247.  Here, the government has submitted a

18  detailed investor-by-investor list of each victim who invested in Telomolecular, derived directly

19  from the victims' bank records.  ECF No. 63 Ex. 1.  Sarad has never disputed the accuracy of this

20  list.  Sarad admits every victim the government listed did in fact receive his material

21  misstatements before choosing to invest in his company.  ECF No. 63 Ex. A-1.  As the record

22  stands, there is sufficient evidence that every investor listed in the government's investor sheet is

23  a victim for purposes of restitution.

24

25  _____
    [2] This section provides, in relevant part, that a restitution order may require a defendant "in the
26  case of an offense resulting in damage to or loss or destruction of property of a victim of the
    offense— if return of the property under subparagraph (A) is impossible, impractical, or
27  inadequate, pay an amount equal to the greater of— . . . the value of the property on the date of
    sentencing, less the value (as of the date the property is returned) of any part of the property that
28  is returned."

1    To determine the amount of restitution owed to each victim, the district court may

2  rely only on evidence that possesses "sufficient indicia of reliability to support its probable

3  accuracy." *Waknine*, 543 F.3d at 557 (citing *United States v. Garcia-Sanchez,* 189 F.3d 1143,

4  1148–49 (9th Cir. 1999)).  If the parties agree on a restitution amount, the court is not required to

5  "consider certain factors or make findings of fact on the record" before issuing a restitution

6  award.  *Peterson*, 538 F.3d at 1077.  However, if the parties dispute the proper amount of

7  restitution, a district court must resolve the dispute applying a preponderance of the evidence

8  standard, and "set forth an explanation of its reasoning, supported by the record."  *United States*

9  *v. Tsosie*, 639 F.3d 1213, 1221 (9th Cir. 2011) (interpreting holding in *Waknine,* 543 F.3d at 556).

10    The court first reviews the *Waknine* requirements for resolving restitution disputes

11  and then analyzes whether the record in this case supports the government's recommended

12  restitution award under *Waknine*.

13          1.     The *Waknine* Standard

14    In *Waknine*, the Ninth Circuit reversed the district court's restitution award

15  because the district court failed to explain how it arrived at a particular restitution amount.  *Id.*

16  The government in *Waknine* admitted the amount of restitution was "unclear" and "[fell]

17  somewhere between $250,000 and $595,000."  *Waknine*, 543 F.3d at 556.  Additionally, the

18  government's "summary of losses" listed only the claimant and the amount of loss, with no

19  explanation, justification, or proof of accuracy.  *See id.* at 557.  The district court ordered

20  restitution in the amount of $371,000, without much explanation as to how it arrived at that

21  amount, and the Ninth Circuit was unable to reverse-engineer that calculation for review with the

22  evidence of record.  *Id.* at 556–57.  The Ninth Circuit reversed the restitution award due to the

23  district court's "inadequate explanation as to how it determined [the] award amount and

24  insufficient reasoning as to why it accepted the nonitemized victim affidavits."  *Id.* at 557.

25    Since *Waknine,* additional Ninth Circuit opinions have grappled with contested

26  restitution calculations and determined that a restitution award cannot be based solely on

27  unsupported and unexplained victim statements of losses.  *See United States v. Andrews*, 600 F.3d

28  1167, 1172 (9th Cir. 2010) (reversing a restitution order because it was issued in exclusive

1    reliance on the victim's evidence as to causation, and the defendant's expert witness was not

2    allowed to testify); *Tsosie*, 639 F.3d at 1222–23 (finding a spreadsheet of doubtful accuracy and

3    offered without sworn statements explaining its entries to be insufficient under the *Waknine*

4    standard).

5              The court next assesses whether the government's proof of restitution in this case

6    satisfies the *Waknine* standard.

7                        2.      Government's Proof of Victims' Losses

8              The government argues the court should award restitution in the amount of

9    $7,047,200.52 and supports this calculation with an itemized loss sheet derived from the victims-

10   investors' bank accounts.  ECF No. 63 Ex. 1.  Sarad argues either for no restitution or for a

11   reduced amount but has not offered an alternative sum.  Because the parties dispute the

12   appropriate amount of restitution, *Waknine* requires that the court explain how the record supports

13   the restitution it ultimately awards.

14             Here, the government's proof of victims' losses, which is consistent with the

15   government's calculation of loss throughout the sentencing process, provides "sufficient indicia

16   of reliability" for this court's decision to award restitution in the requested amount of

17   $7,047,200.52.  *Waknine*, 543 F.3d at 557 (citation omitted).  First, the court notes that, because

18   this case involves fraud, the government need not prove each victim's loss with precision.

19   *Gallant*, 537 F.3d at 1251–54; *Jackson*, 155 F.3d at 949 n.3 (in cases of fraud "[t]he court need

20   only make a reasonable estimate of the loss, given the information available"); *Teehee*, 893 F.2d

21   at 274 (noting "[t]he determination of an appropriate restitution amount is by nature an inexact

22   science"); *United States v. Lewis*, 557 F.3d 601, 615 (8th Cir. 2009) (restitution calculations may

23   involve "approximations and rounding").  After all, "[t]he primary and overarching goal of the

24   MVRA is to make victims of crime whole" and Congress intended district courts "to engage in an

25   expedient and reasonable restitution process, with uncertainties resolved with a view toward

26   achieving fairness to the victim."  *Gordon*, 393 F.3d at 1048.

27             Second, the court notes the government's proof of victims' losses in this case is far

28   more reliable than in *Waknine*.  Unlike in *Waknine,* where the government's non-itemized loss

1  summary contained no details of the origin of each calculation and no support from the record,

2  the government's loss sheet here is itemized and drawn directly from the victims' bank accounts.

3  *Waknine*, 543 F.3d at 557.  Moreover, in *Waknine*, the record revealed significant ambiguity as to

4  the appropriate loss amount and the government conceded the restitution could be anywhere

5  between $250,000 and $595,000.  *Id.* at 556.  Here, Sarad has submitted no alternative loss

6  calculation or any evidence that casts doubt on the accuracy of the government's estimate.

7  Rather, Sarad has affirmed the accuracy of this estimate throughout his sentencing process.  ECF

8  No. 68 at 14; ECF No. 70-7 at 4; ECF No. 70 at 23-35; ECF No. 96 at 6:11–8:5.

9        The government's final tabulation of restitution also falls squarely within the range

10  of restitution Sarad agreed to at his change of plea hearing and in his plea agreement.  ECF

11  No. 61; ECF No. 63 at 3:2–13.  Sarad's plea agreement is relevant evidence of the reliability and

12  fairness of the government's restitution estimate.  *See, e.g.*, *United States v. Wells*, 177 F.3d 603,

13  608–09 (7th Cir. 1999) (upholding restitution order pursuant to 18 U.S.C. § 3663(a)(3) where

14  defendant agreed to pay restitution up to a certain amount in the plea agreement); *United States v.*

15  *Allison*, 59 F.3d 43, 47 (6th Cir. 2007) (same).  Additionally, because Sarad did not object at his

16  sentencing hearing to any facts contained within his pre-sentencing report, the court may properly

17  rely on those facts in calculating restitution.  *United States v. Barton,* 366 F.3d 1160, 1166 (10th

18  Cir. 2004) ("Where ... the PSR recommends restitution under the MVRA for an actual

19  recoverable loss incurred by a victim of the defendant's crime, and the defendant does not object

20  to that request, there is no need under the MVRA for a district court to engage in any additional

21  fact finding with respect to the proper amount or type of restitution") (citation omitted).

22        Lastly, the court notes that the payment of restitution is a component of Sarad's

23  criminal sentence.  ECF No. 100.  Sarad should not benefit from evisceration of this wholly

24  anticipated facet of his sentence by lodging vague and unsupported post hoc complaints.

25        Thus, because the government's detailed list of investors and payments is derived

26  from verifiable bank records, and because Sarad has not cast doubt on the reliability of this

27  calculation, the court finds by a preponderance of the evidence that $7,047,200.52 is an accurate

28  assessment of the victims' losses in this case.

III.   BREACH OF PLEA AGREEMENT

        The government also raises the argument that Sarad's request to pay no restitution, despite agreeing to pay restitution in his plea deal, is effectively a violation of his plea agreement. Because the government is not seeking to void the plea agreement, and is in fact seeking to specifically enforce it, the court does not reach this issue.  Moreover, although Sarad agreed to pay restitution in an amount between $6.5 and 7.5 million, he did not agree to relieve the government of its burden of proving that his restitution obligation includes only those losses caused by his criminal conduct.  ECF No. 63 at 3.  Thus, the court construes Sarad's position as an attempt to hold the government to its burden of properly establishing the amount of restitution. As discussed above, the court finds the government has met its burden of proof.

IV.   CONCLUSION

        Accordingly, the court hereby ORDERS that defendant Sarad shall pay restitution in the amount of $7,047,200.52, payment to begin immediately.  Restitution is to be sent to the Clerk of the Court, who shall forward it to the victims as described in the restitution section of the pre-sentencing report, ECF No. 70.  While Mr. Sarad is incarcerated, payment of restitution is due during imprisonment at the rate of not less than $25 per quarter, and payment shall be made through the Bureau of Prisons Inmate Financial Responsibility Program.  Any interest is waived.

        IT IS SO ORDERED.

        This order resolves ECF No. 104.

DATED:  December 15, 2016.

_____
UNITED STATES DISTRICT JUDGE